**IN THE COURT OF APPEALS OF IOWA**

No. 20-0394
Filed October 7, 2020

**IN THE INTEREST OF N.P.,**
**Minor Child,**

**L.B., Mother,**
        Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Rachael E. Seymour,

District Associate Judge.

        A mother appeals the order terminating her parental rights to her now two-

year-old daughter.  **AFFIRMED.**

        Lori M. Holm, Des Moines, for appellant mother.

        Thomas J. Miller, Attorney General, and Mary A. Triick, Assistant Attorney

General, for appellee State.

        Michael Bandstra, Des Moines, attorney and guardian ad litem for minor

child.

        Considered by Tabor, P.J., and Mullins and Greer, JJ.

**TABOR, Presiding Judge.**

N.P. turned two years old in August. After testing positive for methamphetamine at birth, she has never lived with her mother, Louise. Before N.P. was born, the juvenile court terminated Louise's parental rights to three other children. Citing those prior terminations and Louise's lack of insight into the danger her recent decisions posed to her daughter, the court ended Louise's legal relationship with N.P. Louise appeals that termination order.[1]

Finding clear and convincing evidence to support the court's ruling under Iowa Code section 232.116(1)(g) (2020), we uphold the termination.[2] Neither N.P.'s best interests nor the closeness of her relationship with Louise compel a different result. *See* Iowa Code § 232.116(2), (3)(c).

## I. Facts and Prior Proceedings

This time Louise appeared committed to positive change. The juvenile court had been involved with her family since 2016. Unresolved substance-abuse and mental-health issues resulted in the termination of her parental rights to her son, J.W., in October 2017 and her daughter and son, F.B. and J.B., in February 2018. Soon after N.P. was born in August 2018, the Iowa Department of Human Services (DHS) removed her from Louise's care.

---

[1] The order also terminated the rights of N.P.'s father, Chris, who does not appeal.
[2] We review termination orders de novo. *In re M.W.*, 876 N.W.2d 212, 219 (Iowa 2016). The juvenile court's factual findings, especially its views on witness credibility, inform our decision. *Id.* But they do not dictate the outcome of the appeal. *Id.* The State must show by clear and convincing evidence the statutory grounds to support termination. *In re A.M.*, 843 N.W.2d 100, 110–11 (Iowa 2014). Our first priority is the child's best interests. *See In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially) (identifying safety and the need for a permanent home as the "defining elements" in the best-interests determination).

After N.P.'s removal from her care, Louise lived with her one-time paramour Jacob in Des Moines. But most of Louise's visits with N.P. occurred at her foster family's home in Knoxville.[3] By October 2018, Louise was participating in extended outpatient treatment for substance abuse and provided all negative drug screens for her treatment provider. She also engaged in therapy and attended all visitation offered by the DHS. The court observed that Louise "seems to be much more engaged than during her prior cases."

Louise persuaded the DHS to allow Jacob to supervise a visit at his home in December 2018. After that visit, through social media posts, the DHS discovered that Louise, without supervision, took N.P. to the home of Kenneth, who had a criminal history that included convictions for robbery and intimidation with a weapon and had just finished a prison term. Louise conceded that introducing N.P. to Kenneth without any vetting by the DHS was a mistake in judgment.[4]

Despite her mistake, the DHS recommended and the juvenile court approved a six-month extension of permanency in April 2019.[5] (The county attorney and N.P.'s guardian ad litem (GAL) opposed the delay.) The court was encouraged by Louise's progress toward sobriety. She also completed Safe Care, a curriculum to help parents eliminate common household hazards, avoid medical

---

[3] The same foster family adopted one of N.P.'s biological siblings.

[4] Louise initially lied to the DHS about this incident. She eventually told the social workers that she took N.P. to see Kenneth because she wanted to "build a relationship with him." She later ended her relationship with Jacob and engaged in a romantic relationship with Kenneth.

[5] The juvenile court originally set a permanency hearing for February 2019 but continued it after paternity testing showed that Chris, not Jacob, was N.P.'s father.

neglect, and improve parent-child interactions. In that vein, family safety, risk, and permanency (FSRP) workers testified Louise was open to child-safety suggestions, though their discussions focused more on N.P.'s "physical safety, such as plug-in covers, rather than covering issues related to [Louise's] overall protective capacity, such as exposure to unsafe persons." Louise assured the court that she ended her relationship with Kenneth on the advice of her attorney. The court directed Louise to "be forthcoming regarding any changes or new relationships which may impact this child."

But she was not forthcoming. That summer, questions arose about Louise's commitment to protecting N.P. from unsafe individuals. The foster parents undertook some questionable efforts to verify if Louise had exposed N.P. to unauthorized adults, including following Louise after she picked up her daughter for an overnight visit. Understandably, Louise did not feel supported by the foster parents. The juvenile court discussed the foster father's conduct:

> [The foster father] reiterated they did support reunification until [Louise] began to show "red flags" that things were not going well. Although his behaviors of following [Louise] could be viewed as contradicting his statement, the Court finds his testimony was credible. It was not until after they raised concerns about [Louise's] behaviors and dishonesty, and DHS ignored those concerns, did they make an effort to investigate [Louise's] behavior. [Louise's] claims she had ended her relationship with [Kenneth] following the Permanency hearing were clearly not true.

In August 2019, the county attorney petitioned for termination of parental rights. The court set a hearing for October, but after Louise's attorney withdrew, the court continued the proceedings until December 2019 so new counsel would have time to prepare. That November, Louise acknowledged to the DHS that she

relapsed on methamphetamine but did not return to treatment. She also missed about half of her scheduled visits with N.P.

Louise failed to appear for the December termination hearings but participated by telephone. She testified that she was renting an apartment in Ankeny but was unsure of the "exact address." She attributed her relapse to being "overwhelmed" by this court case. She said she participated in "aftercare" for her substance abuse but only when her work schedule allowed. She admitted having "friends who are addicts" but pledged "my daughter would never be left alone with somebody that was high." She also testified that she remained friends with Kenneth but was not in a "relationship" with him. Despite his conviction for armed robbery, she did not believe he posed a threat to N.P., noting "people can change."

The juvenile court found Louise's testimony showed "her lack of insight into her substance abuse issues, as well as her inability to identify safe individuals."

The court terminated Louise's parental rights to N.P. under Iowa Code section 232.116(1), paragraphs (g) and (h). Louise appeals.

## II. Analysis

Termination appeals involve a three-step analysis. *In re A.S.*, 906 N.W.2d 467, 472–73 (Iowa 2018). First, we decide whether the State has established a ground for termination under section 232.116(1). *Id.* If so, our second step is to judge under the framework in section 232.116(2) whether termination is in the child's best interests. *Id.* Third, we consider whether any of the permissive factors in section 232.116(3) apply to preclude termination. *Id.*

### A.    Statutory Grounds

When the juvenile court grants the petition to terminate under more than one statutory provision, we may affirm on any ground supported by clear and convincing evidence in the record.  *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). We will focus on paragraph (g), which allows for termination of parental rights upon proof of the following elements:

> (1) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (2) The court has terminated parental rights pursuant to section 232.117 with respect to another child who is a member of the same family . . . .
> (3) There is clear and convincing evidence that the parent continues to lack the ability or willingness to respond to services which would correct the situation.
> (4) There is clear and convincing evidence that an additional period of rehabilitation would not correct the situation.

Iowa Code § 232.116(1)(g).  Louise challenges the third element, arguing the evidence suggests that she has responded to services.  She lists her positive strides: "Louise provided clean drug screens to the Department, Louise attends therapy, Louise works full time, Louise attended her visitations, Louise completed safe care, Louise had safe and stable living.  Louise had appropriate housing that was approved and she was exercising overnight unsupervised visits."

In response, the child's GAL claims Louise has shown an "inability to benefit" from substance-abuse treatment and a "willingness to place her children in the care of dangerous caregivers."  The GAL drew a common thread among Louise's past and present termination proceedings: "In all three cases the mother had abused substances and failed to address her long-standing substance abuse

and mental health disorders. In each case, the mother had left the children in the care of abusive fathers or other caregivers."

We agree with the GAL. The juvenile court offered a good summary of its findings: "Given the length of time services have already been provided, [Louise's] lack of insight, and the attitude she demonstrated during the termination hearing, the Court finds she lacks the ability or will to respond to services that would correct the situation and further time for rehabilitation would not correct the situation." Given the court's front-row seat, we defer to its factual findings here.

True, this termination was different. Louise came closer to reunification than she did in her earlier cases. Yet, by the time of the termination hearing, the State had amassed clear and convincing evidence that she was not responding to services, which would correct the situation. *See* Iowa Code § 232.116(1)(g)(3). She relapsed on methamphetamine and did not reengage in services. On the strength of this record, termination was proper under paragraph (g).

## B. Best Interests

Louise next contends the court should not have terminated her parental rights because she has a bond with N.P. She points to the FSRP reports that detail the positive interactions between her and N.P. Again, the GAL paints a different picture: "The mother on multiple occasions brought people with her to the visitation in violation of DHS directives. Louise was more interested in showing off her child to others than serving as a parent figure."

We decide best interests within the framework offered by our legislature. Iowa Code section 232.116(2) focuses on the child's safety, as well as the best placement for furthering her "long-term nurturing and growth" and her "physical,

mental, and emotional condition and needs." *See In re P.L.*, 778 N.W.2d 33, 40 (2010) (rejecting use of unstructured best-interests test). Our consideration also includes the child's integration into her foster family and whether the foster family is willing to adopt the child. *See* Iowa Code § 232.116(2)(b).

We first examine N.P.'s safety. On a basic level, Louise may be correct that her success in mastering the Safe Care curriculum signals a lower risk of harm in the home. But on a different plane, Louise displays a cavalier attitude toward the danger posed by her paramours and friends who are addicts. Both the social workers and GAL worry that Louise may compromise N.P.'s safety by exposing her to adults who have criminal histories or use drugs. The record supports their concern. Louise has not reassured the professionals in this case that she is able to protect N.P. from harmful influences.

Also, the record does not show that placement with Louise would promote N.P.'s long-term nurturing and growth. The foster parents are willing to adopt her. They testified N.P. was happy and enjoyed playing with the other children in their home. Those children included N.P.'s biological brother, J.W., whom they already adopted. Describing their sibling bond, the foster father testified: "They definitely click." Under these circumstances, termination is in N.P.'s best interests.

## C. Closeness of Parent-Child Relationship

Louise also contends termination would be detrimental to N.P. because of the closeness of their parent-child relationship. *See id.* § 232.116(3)(c). We have no doubt Louise has forged a bond with N.P. during their visits. But the record does not suggest their relationship was so close that N.P. would be disadvantaged by the termination. *See In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010). In fact,

N.P.'s daycare provider reported that N.P. is sometimes "hesitant to go with Louise during pickup." In our de novo review, we find section 232.116(3)(c) does not preclude termination.

**AFFIRMED.**